IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN LABORERS PENSION FUND,
WISCONSIN LABORERS HEALTH FUND,
WISCONSIN LABORERS APPRENTICESHIP
& TRAINING FUND, WISCONSIN
LABORERS-EMPLOYERS COOPERATION
AND EDUCATION TRUST FUND,
WISCONSIN LABORERS DISTRICT
COUNCIL, and JOHN J. SCHMITT (in his
capacity as Trustee),

       Plaintiffs,      OPINION AND ORDER

  v.               16-cv-127-wmc

JI CONSTRUCTION, LLC, and JEREMY IVERSON,

       Defendants.

---

In this civil suit, plaintiffs assert claims against defendant JI Construction, LLC, under section 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, and section 301(a) of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185(a), for allegedly failing to make required contributions to employee benefit funds. Now before the court is plaintiffs' partial motion for summary judgment, which seeks a declaration as a matter of law that JI Construction failed to make contributions required under the terms of its collective bargaining agreement, as well as that defendants' counterclaim for abuse of process is meritless. For the reasons explained below, the court will grant plaintiffs' motion in part and deny it in part, finding that JI Construction failed to fulfill its obligation to make required contributions for work

performed by certain employees and dismissing defendants' abuse of process counterclaim.

UNDISPUTED FACTS[1]

**A.  The Parties**

Plaintiffs consist of employee benefit plans, as well as their trustees and fiduciaries.  Defendant JI Construction, LLC, is incorporated in the state of Wisconsin and has its principal place of business in Livingston, Wisconsin.  Jeremy Iverson is JI Construction's principal and owner, and he lives in Wisconsin.  Regardless, this court has jurisdiction over these federal labor law claims.

**B.  Letter of Assent**

On March 1, 2007, JI Construction, by its owner, Jeremy Iverson, signed a one-page "Letter of Assent."   The parties dispute whether his signature bound JI Construction to the underlying 2006 multi-employer, collective bargaining agreement ("CBA") with the Wisconsin Laborers' District Council ("District Council"), the union representative, and the Associated General Contractors of Wisconsin Inc. ("AGC"), which was empowered to negotiate on behalf of employers for the period from 2006 through 2011, absent termination by an employer.  The first paragraph of the Letter of Assent unambiguously reads: "This Agreement is entered into between [JI Construction] its successors and assigns, hereinafter referred to as the "Contractor" and the Wisconsin

---

[1] The court finds the following facts taken from the parties' proposed findings of fact to be material and undisputed when viewed in a light most favorable to defendants as the non-moving party.

Laborers' District Council, its successors and assigns, hereinafter referred to as the "Union." (Decl. of Jeremy Iverson Ex. 1 [hereinafter "Letter of Assent"] (dkt. #49-1).) In support of their argument that JI Construction bound itself to the CBA by signing the letter of assent, plaintiffs point to the language of the first two numbered paragraphs of the Letter of Assent.

> The Contractor and the Union agree as follows:
>
> 1.   The Contractor recognized the Union as the sole and exclusive bargaining representative for and on behalf of the employees of the Contractor within the territorial and occupational jurisdiction of the Union, as specified in the Agreement between the Union and the Municipal/Utilities Division, WI Chapter, Associated General Contractors of America Inc.
>
> 2.   The Union and the Contractor hereby adopt the Labor Agreement between the Union and the "Municipal/Utilities Division, WI Chapter, Associated General Contractors of America Inc." dated June 1, 2006 and both the Contractor and the Union agree to be bound by all the terms and conditions of said Agreement.

(*Id.*)

In contrast, defendants assert that JI Construction did not intend to become a party to *any* CBA by signing the Letter of Assent, but rather intended only to reach an agreement with Laborers Local 464 to be able to hire its workers. (Defs.' Resp. PFOF (dkt. #48) ¶ 5 (citing Decl. of Jeremy Iverson (dkt. #49) ¶ 11).) Iverson reports reaching that conclusion "[b]ased upon the Letter of Assent itself and how it was presented." (Decl. of Jeremy Iverson (dkt. #49) ¶ 13.) Specifically, Iverson declares that the Local 464 representatives who presented him with the Letter of Assent did not inform him that

it "was in anyway related to a collective bargaining agreement" and that "it appeared that the District Council and the Local 464 were all the same." (*Id.* at ¶¶ 8, 14.)

'

## C. Attempted Terminations

Even if JI Construction became a party to the 2006 CBA by signing the letter of assent, JI Construction claims to have effectively terminated its participation in that CBA and subsequent ones.  Plaintiffs, in contrast, again point to the language in the Letter of Assent, which includes an "evergreen clause" regarding adoption of successor CBAs and termination:

> 3.   This Agreement and the adoption of the Agreement between the Union and the Municipal/Utilities Division, WI Chapter, Associated General Contractors of America, Inc. shall remain in effect to and including the expiration of the Agreement between the Union and the Municipal/Utilities Division, WI Chapter, Associated General Contractors of America, Inc.  **This Agreement shall continue in effect from year to year thereafter and specifically adopt any successor agreement entered into between the union and the Municipal/Utilities Division, WI Chapter, Associated General Contractors of America, Inc. subsequent to the expiration date of the Agreement adopted herein, unless notice of termination or amendment is given in the matter provided herein.**
>
> . . . .
>
> 5.   Either party desiring to amend or terminate this Agreement **must notify the other in writing at least sixty days prior to the expiration of the Agreement** between the Union and the Municipal/Utilities Division, WI Chapter, Associated General Contractors of America, Inc.

4

(Letter of Assent (dkt. #49-1) (emphasis added).)  The 2006, 2011 and 2014 CBAs also expressly required termination notifications to be in writing.  (Pls. Reply PFOF (dkt. #52) ¶ 7-10.)

For purposes of summary judgment, the court will assume that Iverson orally notified representatives of Laborers Local 464 in 2008 that JI Construction wished to "opt out" of the CBA.  (Defs.' Resp. PFOF (dkt. #48) ¶ 13.)  There is no dispute however, that JI Construction first provided *written* notice to the District Council on August 29, 2015, that it intended to terminate its participation in the CBA.[2]

Plaintiffs acknowledge that this written notice was effective to terminate JI Construction as a party to the CBAs going forward.  They assert, however, that the terms of the 2014 CBA, which succeeded the 2011 CBA, required JI Construction to comply with its terms, including its contribution requirements, through May 31, 2017, as the CBA provides that it "shall continue in force until midnight" of that date.  (Pls.' Reply PFOF (dkt. #52) ¶ 12.)

### D. Covered Work

In this lawsuit, plaintiffs seek unpaid contributions for work performed under the terms of the 2006 and 2014 CBAs.[3]  The parties agree that those CBAs only require contributions for "covered work" performed by laborers on public works construction projects, including "flagging."  The parties disagree, however, whether several JI

---

[2] JI Construction followed-up with another written notice of termination on October 5, 2016.

[3] Since 2014, JI Construction has only made contributions for three hours worked by Casey Shemak and three hours worked by Terrance Udelhoven.

Construction employees performed covered work, as well as whether the CBAs require JI Construction to make contributions for work performed by Mitchell Trecek, an independent contractor.

JI Construction has prepared an "Employee Payroll Classifications" document, which indicates that four individuals -- Johnathan Crapp, Stephanie Rickard, Jonathan Stivarius and Brian Welsh -- worked as flaggers in August of 2014.  (Dep. of Jeremy Iverson Ex. 6 (dkt. #45-2).)  That same document also reflects flagging work done by Crapp and Rickard in September of 2014.  (*Id.*)  Iverson testified at his deposition that JI Construction misclassified Crapp and Welsh as having done flagging work on that document when they instead drove dump trucks, but Iverson did not make the same assertions as to Rickard and Stivarius.[4]  (Pls.' Reply PFOF (dkt. #52) ¶¶ 31, 32.)  Moreover, independent contractor Trecek testified at his deposition that he saw Rickard and Stivarius flagging for JI Construction in 2014.[5]  (*Id.* at ¶ 34.)

Nevertheless, defendants assert that whether Rickard and Stivarius performed covered work for JI Construction's Highway 133 project remains a disputed fact because

---

[4] In light of Iverson's testimony at his deposition, defendants do not raise a genuine dispute as to whether JI Construction also misclassified other employees.  (Pls.' Reply PFOF (dkt. #52) ¶ 32 (citing Dep. of Jeremy Iverson (dkt. #45) at 38:4-12).)  In addition, the parties disagree whether Crapp's and Welsh's dump truck driving was covered as "tending" work, which "includes both the preparation of, and the delivery of materials to mechanics of other crafts," but the court need not resolve this dispute at summary judgment for the reasons explained in the opinion section below, however likely it appears that JI Construction's dump truck drivers performed tending work by delivering sand to its job sites.  (Defs.' Resp. PFOF (dkt. #48) ¶¶ 40-44.)

[5] Absent any contrary evidence, defendants' response to plaintiffs' proposed fact regarding Trecek's deposition testimony fails to create a genuine dispute of fact, particularly when JI Construction is in the *best* position to dispute that fact and could not.  (Pls.' Reply PFOF (dkt. #52) ¶ 34.)

each of them, along with Crapp and Welsh, signed affidavits asserting that they "did not perform work covered by the [CBAs]."[6]   (Defs.' Resp. PFOF (dkt. #48) ¶ 33 (citing Affidavits (dkt. #51)).)   Similarly, although Iverson testified at his deposition that Alex Holmes performed laborers' work at a JI Construction public works construction project in Verona, Wisconsin, Holmes also submitted a signed affidavit making the same assertion.[7]   (Pls.' Reply PFOF (dkt. #52) ¶ 37.)   Ben Bollent, another JI Construction employee, did not sign an affidavit disclaiming covered work, however, and Iverson testified at his deposition that Bollent performed covered work on the Verona project, including laying pipe and digging trenches with a shovel.[8]

# OPINION

Plaintiffs move for summary judgment as to defendant JI Construction's liability on their ERISA and LMRA claims for failing to make contributions for covered work

---

[6] Defendants do not dispute that the Highway 133 project was a public works construction project.  (Pls.' Reply PFOF (dkt. #52) ¶ 36.)

[7] Defendants do not raise a genuine dispute as to whether the Verona project was a public works construction project, given there appears no dispute that "the Verona Project consisted of putting in water and sewer mains" (Pls.' Reply PFOF (dkt. #52) ¶ 39), but they do argue that JI Construction was not required to make contributions for worked performed on that project, since JI Construction began working on it in July of 2016, well after JI Construction sent its first written notice to withdraw as a party to the CBAs in August of 2015.

[8] Again, defendants fail to raise a genuine dispute as to whether Bollent performed covered work. In response to plaintiffs' proposed fact that "[a]t the Verona project, JI employees Ben Bollent and Alex Holmes performed laborers work including laying pipe and digging trenches using a shovel," defendants purport to dispute that fact by asserting, "Iverson testified that he was the only person who performed laborers work at Verona."  (Defs.' Resp. PFOF (dkt. #48) ¶ 37.)  In fact, Iverson testified at his deposition that he was "the only person who works on [his] two feet on the Verona project," and after plaintiffs' counsel asked Iverson to clarify whether anyone else did "pipe laying work or digging work with a shovel" in Verona, Iverson named Bollent.  (Dep. of Jeremy Iverson (dkt. #45) at 83:5-25.)

under the relevant CBAs from 2011 to 2017. Plaintiffs also move for summary judgment on defendants' counterclaim for abuse of process. The court will address those motions separately.

## I. ERISA and LMRA Liability

### A. Letter of Assent

As the Seventh Circuit has explained, there is a "general rule that an employer will not be held to the terms of a collective bargaining agreement negotiated between a union and a multi-employer association unless the employer has expressed an unequivocal intention to be bound." *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 606 (7th Cir. 2002). But here, the Letter of Assent states unambiguously that JI Construction was entering into an agreement with the Wisconsin Laborers' District Council by which the parties were adopting and agreeing to be bound by all of the terms of the 2006 CBA. Since the parties' intent is denoted by that signed agreement, any argument that JI Construction did not understand the significance of signing the Letter of Assent is dubious at best. *See Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988) ("Reference[] . . . to the importance of 'intent to be bound' [is] misleading if taken literally."). The best, indeed controlling, signal of JI Construction's intent is Iverson's signature on the Letter of Assent: "[a] signatory to a contract is bound by its ordinary meaning even if he gave it an idiosyncratic one; private intent counts only if it is conveyed to the other party and shared." *Id.*

Although Iverson now asserts that he went to Laborers Local 464 only "to find out how to hire a union laborer," and that "JI did not desire to enter into a collective bargaining agreement or assign its bargaining rights," he never asserts that he informed the District Council or Laborers Local 464 about it before signing the letter.  (Decl. of Jeremy Iverson (dkt. #49) ¶¶ 6, 11.)  Nor, contrary to defendants' argument, does the lack of a "specific delegation and assignment of bargaining rights" in the Letter of Assent somehow undermine JI Construction's intent (Def.'s Opp'n Br. (dkt. #47) at 3), as the letter's unequivocal language binding it to the 2006 CBA -- as well as successor CBAs absent timely, written termination -- created an unambiguous commitment to abide by its terms.  *See Robbins*, 836 F.2d at 332 ("You can't escape contractual obligation by signing with your fingers crossed behind your back, even if that clearly shows your intent *not* to be bound.") (emphasis in original).[9]

The bottom line is that plaintiffs had the right to rely upon defendants' written commitment in March of 2007 until their August of 2015 termination notice became effective at the end of 2017 under the terms of the then-effective 2014 CBA.  Accordingly, there exists no material dispute of fact as to JI Construction's intent to be bound by the 2006 CBA.

---

[9]  Defendants' argument that the Letter of Assent was not the same as the "Assumption of Agreement" form attached to the 2006 CBA somehow indicates its intent not to become bound by the terms of the CBA fails for the same reasons.  Similarly, the other facts defendants advance to undermine JI Construction's intent to be bound by the unambiguous terms of the CBAs -- that it did not stay apprised of CBA negotiations, was not a member of the AGC, and did not receive informational mailings from the AGC -- don't cut either way.  *Cf. Trs. of UIU Health and Welfare Fund v. N.Y. Flame Proofing Co.*, 828 F.2d 79, 83 (2d Cir. 1987) (membership in a multi-employer association responsible for bargaining is not enough to reflect intent to be bound by the agreements it negotiates).

**B. Fraud in the Execution**

Defendants also raise a fraud in the execution defense to plaintiffs' claim that they were bound by the 2006 CBA. *See Laborers' Pension Fund v. A & C Envtl., Inc.*, 301 F.3d 768, 780 (7th Cir. 2002) ("[F]raud in the execution is a viable defense under ERISA section 515[.]").  To make out a fraud in the execution defense, however, JI Construction must show both that: (1) it did not know it was signing an agreement to make contributions under that CBA; and (2) it reasonably relied on misrepresentations from the union. *Id.*

While Iverson avers to the first element, reliance on a misrepresentation is not reasonable under the scecond if it was negligent. *Wis. Laborers Health Fund, Bldg. & Public Works Laborers Vacation Fund v. Safe Abatement for Everyone, Inc.*, No. 13-cv-866-bbc, 2014 WL 2873880, at *3 (W.D. Wis. June 17, 2014).  This includes a person, like Iverson now claims to be, who "signs a contract without ascertaining its contents and is not prevented from doing so, even if induced to sign by fraudulent misrepresentations." *Id.* (quoting *Ritchie v. Clapper*, 109 Wis.2d 399, 304, 326 N.W.2d 131, 134 (Ct. App. 1982)).  Therefore, defendants' insistence that the Letter of Assent could have included more information about the terms of the 2006 CBA, or that Iverson was "not provided a copy" of the CBA, fails to establish the fraud necessary to undo the plain language of the Letter of Assent committing JI Construction to "be bound by all the terms and conditions" of the CBA, especially since Iverson does not even assert that he asked to review the CBA, much less was prevented from doing so.  Indeed, contrary to allusions in defendants' brief, Iverson does not even claim that anyone actually told him that he was

10

*not* agreeing to be bound by the terms of the 2006 CBA by signing the Letter of Assent.[10] For these reasons, defendants cannot establish fraud in the execution of the Letter of Assent.

### C. 2011 and 2014 CBAs

By signing the Letter of Assent, JI Construction agreed to be bound by the terms and conditions of the 2006 CBA, as well as any succeeding CBAs, absent written notice of amendment or termination. Defendants do *not* argue that Iverson's oral notice of termination to a Laborers Local 464 representative in 2008 was effective to excuse JI Construction's adherence to the terms of the 2011 CBA or the 2014 CBA, nor were plaintiffs required to give oral notice force under the terms of the Letter of Assent, ERISA or the LMRA. *See Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1154 (7th Cir. 1989) ("Section 302(c)(5)(B), like § 515, prevents a court from giving force to oral understandings between union and employer that contradict the writings.").

Defendants instead argue that Iverson's oral notice rendered unreasonable any belief held by plaintiffs that the AGC had the apparent authority to negotiate on behalf

---

[10] Viewing Iverson's declaration in the light most favorable to defendants as the nonmoving party, he "went on behalf of JI to the Laborers Local 464 . . . to find out how to hire a union laborer" and "was told that all [he] needed to do was sign a single page document." (Decl. of Jeremy Iverson (dkt. #49) ¶¶ 6, 7.) As plaintiffs point out, that representation was *accurate* as far as it goes. So, even though Iverson asserts that he "was not informed that the Letter of Assent was in anyway related to a collective bargaining agreement or that by signing JI could be bound by a collective bargaining agreement," (*Id.* at ¶ 8), the one-page agreement's plain language makes any reliance on the union representative's arguably incomplete statement at best unreasonable and at worse inexcusable.

of JI Construction with respect to the 2011 and 2014 CBAs.  Plaintiffs are correct, however, that their right to receive contributions from JI Construction does not derive from any apparent authority of the AGC, but rather JI Construction's assent to be bound by the terms and conditions of those CBAs by virtue of its agreement to the Letter of Assent.  Defendants' apparent authority argument, therefore, fails.  *Cf. Moriarty v. Pepper*, 256 F.3d 554, 558 (7th Cir. 2001) (noting, after reversing district court's finding that defendant's signature expressly authorized bargaining on his behalf, that district court did not consider whether defendant had "manifested his unequivocal intent to be bound in some other fashion," including through apparent authority).

That leaves defendants' argument that JI Construction's *written* notice of termination dated August 29, 2015, extinguished any further obligation to make contributions for covered work after that date.  In response, plaintiffs argue that while the written notice may have been effective to terminate JI Construction's intent to be bound by any subsequent CBAs, the terms of the 2014 CBA require JI Construction to continue making contributions through May 31, 2017, which is the date that CBA expires.  The court agrees with plaintiffs that the relevant question regarding JI Construction's contribution obligations is what the then-binding 2014 CBA states.  Regardless, even the Letter of Assent contemplates that written notice will be effective upon "expiration" of the operative CBA.

Courts apply federal common law rules of contract interpretation to plans governed by ERISA.  *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Mich., Inc.*, 674 F.3d 630, 634 (7th Cir. 2012).  Therefore, courts first determine whether the

12

contract is unambiguous, and if it is, limit interpretation of its meaning to its four corners. *Id.* With respect to termination, the 2014 CBA provides:

> This Agreement shall become effective on the 2nd day of June, 2014 and shall continue in force until midnight, May 31, 2017.
>
> If a change is desired by either party to this Agreement, a written notification shall be given at least sixty (60) days before the expiration date, otherwise the Agreement shall continue in force and effect from year to year.

(Pls.' Reply PFOF (dkt. #52) ¶ 12 (citing Decl. of John Schmitt Ex. 3 (dkt. #43-3) at 73).)

In *Waste Management*, the Seventh Circuit explained why similar language in a different CBA precluded an employer from immediately cancelling its contribution obligations by a written notice of termination:

> "This Agreement shall be in full force and effective from February 1, 2005 to and including January 31, 2009, and shall continue in full force and effect from year to year thereafter unless written notice of desire to terminate or cancel the Agreement is served by either party upon the other by Certified Mail at least sixty (60) days prior to the date of expiration."
>
> Waste Management asserts that the opt-out provision in the last clause could be interpreted to allow either party to the CBA to unilaterally cancel the agreement at any time during the four-year period of the CBA, so long as sixty days' notice was provided. . . .
>
> Waste Management's reading of the 2005 CBA is grammatically inaccurate and unreasonable. The first clause, stating the duration of the CBA, is separated from the remainder of the language by a comma, and then is followed by an automatic renewal provision. The opt-out provision follows, modifying only the automatic renewal provision; the opt-out provision does not modify the first clause. Thus, the

> CBA unambiguously allows either party to unilaterally cancel the automatic renewal of the 2005 CBA, so long as sixty days' notice is provided prior to the expiration of the CBA. It does not, as Waste Management asserts, allow for the unilateral cancellation of the CBA during the stated term of the CBA. As the district court aptly noted, Waste Management's reading of the CBA "would be absurd if for no other reason than it would allow either party to opt out of the contract at any time during the four-year agreement except for the last sixty days." Plainly, the terms of the relevant documents are unambiguous.

674 F.3d at 635-36 (citation and footnote omitted).

Here, the duration and automatic renewal provisions in the 2014 CBA are separated by a paragraph, not a comma, and the opt out clause precedes the renewal clause, but the principle recognized in *Waste Management* still applies -- the opt out provision modifies the automatic renewal provision, and not the clause stating the CBA's duration. Thus, under the unambiguous terms of the then-effective CBA, JI Construction's contribution obligations were not immediately terminated by JI Construction's written notice, and they continue through May 31, 2017.

### D. Covered Work by JI Construction Employees

Next, plaintiffs move for summary judgment as to defendants' liability for failing to make contributions for covered work performed by several employees under the operative terms of the 2011 and 2014 CBAs. Specifically, plaintiffs claim that JI Construction failed to make required contributions "for the flagging work performed by Rickard and Stivarius, the laborers' work performed by Holmes and Bollent on the Verona project, or the tending work performed by its dump truck drivers on all of its

14

projects." (Pls.' Opening Br. (dkt. #40) at 16.)  There is no dispute that flagging, pipe laying and digging trenches are all types of covered work.

Plaintiffs' evidence that JI Construction employees performed covered work for which JI Construction did not make required contributions consists solely of: (1) a document prepared by JI Construction, which identies Rickard and Stivarius as flaggers in 2014; (2) Iverson's deposition testimony that Holmes and Bollent performed covered work on the Verona project; and (3) independent contractor Trecek's deposition testimony that he saw Rickard and Stivarius working as flaggers.

Defendants argue that despite the document classifying Rickard and Stivarius as flaggers, as well as Trecek's testimony that those employees performed covered work, there is still a genuine dispute of fact as to whether they actually did, since Crapp, Rickard, Stivarius, Welsh and Holmes signed affidavits stating that they "did not perform work covered by the labor agreement." (Dkt. #51.)  Plaintiffs argue that given their evidence proving otherwise, the conflicting, bare-bones affidavits deserve no weight at summary judgment, and thus they cannot create genuine disputes of fact.

The Seventh Circuit has explained that "[c]onclusory statements, not grounded in specific facts, are not sufficient to avoid summary judgment." *Bordelon v. Bd. of Educ. of Chi.*, 811 F.3d 984, 989 (7th Cir. 2016).  In *Bordelon*, the Seventh Circuit held that assertions lacking specific facts in support, including that the employer "showed favoritism for the younger workers against the older workers," were inadequate to raise a genuine dispute regarding discrimination.  *Id.* at 991.  Plaintiffs also point to *Resolution Trust Corp. v. Juergens*, 965 F.2d 149 (7th Cir. 1992), in which the Seventh Circuit held

that an affiant's assertions that he "received no 'good and valuable consideration' or 'benefit of the bargain'" were properly ignored at summary judgment, since he could not prove lack of consideration at trial "just by taking the stand and reciting legal buzzwords." *Id.* at 153.

Here, the employees' assertions that they "did not perform work covered by the labor agreement" are mixed statements of law and fact, and the affidavits lack any details regarding what type of work they actually *did* perform or their understanding of what type of work was covered by the CBA. Therefore, those affidavits are arguably insufficient to create genuine disputes of fact under *Bordelon* and *Juergens*.

Still, the affidavits are the only sworn statements from those employees that are in the record, and the Seventh Circuit has urged district courts to be cautious in applying the sham affidavit rule, which prevents parties from creating genuine factual disputes at summary judgment by submitting affidavits that contradict a witness's *own* prior sworn testimony. *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996). Moreover, viewed in the light most favorable to defendants, it is at least arguable that employees generally have a suitable understanding of what work was covered by the CBA. Finally, those workers were in the best position to recall what work they did or did not perform.

Regardless, defendants have no evidence contradicting plaintiffs' proof that JI Constriction failed to make contributions for covered work performed by: (1) Bollent, who signed no contrary affidavit; and (2) Holmes, whose affidavit states only that he did not perform covered work during the period of May 1 through May 31, 2015 (dkt. #51

at ECF 1).  Therefore, plaintiffs are entitled to summary judgment that JI Construction is liable for failing to make contributions required by the 2014 CBA.  To the extent defendants continue to rely on the unlikely possibility that the employees who signed conclusory affidavits could overcome the contradictory evidence that they performed covered work at trial, their veracity and the underlying foundation for their statements can be addressed at the damages trial that will be necessary in any event.

### E.  Contributions for Trecek

Next, plaintiffs move for summary judgment regarding contributions for Trecek, explaining that they "are not asking the Court to resolve [the] factual dispute [as to whether Trecek performed covered work] at the summary judgment stage," but rather "are asking the Court to rule as a matter of law that, to the extent Trecek did perform covered work, his status as a common law independent contractor is not a valid defense to JI's obligation to make contributions to the Plaintiffs for the hours of covered work Trecek performed."  (Dkt. #40 at 9.)  Plaintiffs fail to make that showing.

In their opening brief, plaintiffs raise two arguments regarding whether the 2011 and 2014 CBAs require employers to make contributions for hours worked by independent contractors.  In support of both arguments, plaintiffs rely on two provisions of the CBA: (1) "all of the work covered by this agreement shall be done under and in accordance with the terms and conditions of the agreement"; and (2) "[t]he contractor shall sublet work under this Agreement only to an employer whose workmen receive at

17

least the standards of wages, fringe benefits . . . and working conditions provided by this agreement." (Defs.' Resp. PFOF (dkt. #48) ¶¶ 21, 27.)

Citing *Mazzei v. Rock-N-Around Trucking, Inc.*, 246 F.3d 956 (7th Cir. 2001), plaintiffs first argue that "[t]he CBA[], by specifying that independent contractors must receive the compensation and working conditions provided by the agreement, makes clear that its terms apply to common law employees and common law independent contractors alike. Common law independent contractors therefore are employees covered by the agreement[.]" (Dkt. #40 at 9.) While plaintiffs concede that they cannot point to similar, unambiguous language in the CBAs at issue here, they persist in arguing that "the teaching of *Mazzei* is nonetheless applicable: A CBA can require an employer to make contributions measured by the hours worked by non-employees, by including those non-employees in its definition of employees covered by the CBA." (Pls.' Reply Br. (dkt. #53) at 13.) However, plaintiffs' failure to identify any language in the CBAs that defines covered employees to include independent contractors is fatal to this argument.

Plaintiffs' second argument is that because JI Construction paid Trecek a lower hourly rate than "the total package hourly compensation of $41.22 that the CBA required for a general laborer," the funds are entitled to contributions. (Pls.' Opening Br. (dkt. #40) at 11.) Specifically, plaintiffs point to the provision in the CBAs requiring "all of the work covered . . . [to] be done under and in accordance with [its] terms and conditions," arguing that "[a]n employer owes contributions to the Funds for hours worked by a common law independent contractor, when its subcontracting of work to the independent contractor violated the plain language of the parties' agreement." (*Id.*)

In response, defendants point out that the CBAs also state that "[t]he provisions of this Article shall be construed to mean that the subcontracting contractor shall only have to pay the rates and fringes as called for in his particular union agreement, unless higher wages and/or fringes are called for in the prevailing wages determinations as established by the State or Federal agency for a particular project." (Decl. of John Schmitt Ex. 2 (dkt. #43-2) at 6; Decl. of John Schmitt Ex. 3 (dkt. #43-3) at 10.) The CBAs' reference to the subcontractor's own union agreements, therefore, undermines any argument that JI Construction was obligated to pay Trecek the $41.22 hourly rate, much less contribute to the funds if he or his employer did not.[11]

## II. Abuse of Process

Plaintiffs move separately for summary judgment on defendants' counterclaim for abuse of process. The two elements of an abuse of process claim under Wisconsin law are: "(1) a purpose other than that which the process was designed to accomplish, and (2) a subsequent misuse of the process." *Strid v. Converse*, 111 Wis.2d 418, 427, 331 N.W.2d 350, 355 (1983); *see also Brownsell v. Klawitter*, 102 Wis.2d 108, 115, 306 N.W.2d 41 (Wis. 1981) (describing the two elements as "'a willful act in the use of

---

[11] Plaintiffs raise a third argument in their reply -- that "[a]lternatively, JI violated the CBA by assigning covered work to Trecek, for reasons not limited to its failure to pay Trecek the wages and fringe benefit or equivalent payments required by the CBA" (Pls.' Reply Br. (dkt. #53) at 13) -- but since it was not presented in their opening brief, it is waived. *See Nelson v. La Crosse Cty. Dist. Attorney*, 301 F.3d 820, 836 (7th Cir. 2002) ("It is well-settled that issues raised for the first time in a reply brief are deemed waived."). Even if preserved, their new argument would fall short at summary judgment, as it relies on several assertions not supported by citation to any facts, including that "JI as a practical matter could not subcontract covered work." (Pls. Reply Br. (dkt. #53) at 14.)

process not proper in the regular conduct of the proceedings' and an 'ulterior motive.'")

(quoting *Thompson v. Beecham*, 72 Wis.2d 356, 362, 241 N.W.2d 163 (Wis. 1976)).

Proving the misuse element requires a showing of:

> [s]ome definite act or threat not authorized by the process, or
> aimed at an objective not legitimate in the use of the
> process . . . ; and there is no liability where the defendant has
> done nothing more than carry out the process to its
> authorized conclusion, even though with bad intentions.

*Thompson*, 72 Wis.2d at 362 (quoting Prosser, Law of Torts (4th Ed. 1971), sec. 121, pp.

857, 858).

According to defendants, "the abuse of process claim is based upon the Plaintiffs'
ulterior motive in bringing their claims and instituting an investigation by the
Department of Workforce Development ('DWD').  The Plaintiffs sought to strong-arm
the Defendants into ceding to the Plaintiffs' demands to re[-]sign as a union contractor
and pay contributions."  (Defs.' Opp'n Br. (dkt. #47) at 15.)  Defendants also claim that
plaintiffs' abuse of process is further shown by their assertion of civil theft and
conversion claims against Iverson as an individual defendant "to compel the Defendants
through fear of personal liability to pay the Plaintiffs for the alleged contributions," since,
defendants argue, plaintiffs lacked a good faith basis to do so and the claim was
preempted by federal law.  (*Id.* at 16.)

Even drawing all reasonable inferences in favor of defendants at summary
judgment, defendants' abuse of process counterclaim borders on the frivolous.
Defendants cannot maintain an abuse of process claim based on plaintiffs' desire for JI
Construction to be a "union contractor and pay contributions," since succeeding on their

unpaid contribution claims requires a finding of liability that JI Construction *is* bound by the terms of the CBAs, which is, of course, a valid use of legal process. *See Schmit v. Klumpyan*, 2003 WI App 107, ¶ 21, 264 Wis.2d 414, 663 N.W.2d 331 ("As explained by the [Restatement 2d of Torts], . . . there is no action for abuse of process when the process is used for the purpose for which it is intended, but there is . . . an ulterior purpose or benefit[.]").  Furthermore, even crediting defendants' assertion that plaintiffs asserted a conversion claim against Iverson as an individual defendant to put pressure on him, as the owner of JI Construction, to settle the unpaid contribution claims, a settlement would reflect a legitimate outcome in civil litigation, not a misuse of process, and so any ulterior motive could not support an abuse of process claim. *See id.* Moreover, unlike a claim for malicious prosecution, "the gist of the [abuse of process] tort is not commencing an action or causing process to issue without justification, but misusing, or misapplying process justified in itself for an end other than that which it was designed to accomplish." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 121, at 897 (5th ed. 1984).

Admittedly, this is defendants' strongest argument in support of their abuse of process claim, especially since plaintiffs have moved to withdraw them for lack of evidentiary support, but given the relatedness of the claims against Iverson as an individual defendant to the unpaid contribution claims, this conduct is a far cry from the "usual case . . . of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or take some other action or refrain from it." *Sweeney v. Flanagan*, 92 F.3d 1187 (Table), 1196 WL 414170 (7th Cir. July 23, 1996)

(quoting Restatement (Second) of Torts § 682 cmt. b); *see also Quarra Stone Co., LLC v. Yale Univ.*, No. 13-cv-790-slc, 2014 WL 3120995, at *7 (W.D. Wis. July 8, 2014); *Triester v. 191 Tenants Assn.*, 415 A.2d 698, 702 (Pa.Super.1979) ("The classic example [of an abuse of process] is the initiation of a civil proceeding to coerce the payment of a claim completely unrelated to the cause of action sued upon.").  That plaintiffs' assertion of claims against Iverson as an individual defendant are not enough to support an abuse of process claim is further supported by the pronouncement from the Wisconsin courts that "[b]ecause of its potential chilling effect on the right of access to the courts, the tort of abuse of process is disfavored and must be narrowly construed to insure the individual a fair opportunity to present his or her claim." *Wis. Pub. Serv. Corp. v. Andrews*, 2009 WI App ¶ 19, 316 Wis.2d 734, 766 N.W.2d 232 (quoting *Schmit v. Klumpyan*, 2003 WI App 107, ¶ 6, 264 Wis.2d 414, 663 N.W.2d 331).  Even drawing inferences from a threat to "make [JI Construction] pay one way or another" in the light most favorable to defendants, that threat can at most establish plaintiffs had an ulterior motive, but not that they misused process.

Finally, even crediting defendants' assertion that the District Council filed a wage complaint with the DWD shortly after threatening to make them pay, and assuming that plaintiffs could be held liable for the filing of the wage complaint, defendants again can only establish an ulterior motive at most, offering nothing to suggest that the wage complaint was an abuse of process in view of an objective not legitimate under that particular use of process.  Accordingly, defendants' abuse of process counterclaim will be dismissed.

### III. Next Steps

Consistent with the above, plaintiffs' motion to dismiss defendants' abuse of counterclaim (dkt. #15) is denied as moot.  Plaintiffs' motion for leave to file a second amended complaint (dkt. #33) is granted, since defendants' objection was premised on their now-dismissed abuse of process counterclaim.  Finally, defendants' motion to dismiss plaintiffs' claims against Iverson (dkt. #10) is denied as moot.

In light of the court's rulings, the parties are encouraged to discuss resolving this case, and failing that, to try to reach agreement as to whether the remaining unpaid contribution claims are best addressed by bench trial.  Regardless, the court will strike the final pretrial conference and jury trial now set to begin March 20, 2017, and hold a telephonic scheduling conference on the remaining disputes on March 22, 2017, at 3:00 p.m.

ORDER

IT IS ORDERED THAT:

1. Plaintiffs' motion for summary judgment (dkt. #46) is GRANTED IN PART and DENIED IN PART, consistent with this opinion.

2. The court will hold a telephonic conference on the remaining disputes on March 22, 2017, at 3:00 p.m.  Plaintiffs are to initiate the call.

Entered this 12th day of March, 2017.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge